Matter of Jeffrey O. v New York State Off. of Children & Family Servs. (2022 NY Slip Op 04593)

Matter of Jeffrey O. v New York State Off. of Children & Family Servs.

2022 NY Slip Op 04593

Decided on July 14, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 14, 2022

531988
[*1]In the Matter of Jeffrey O., Petitioner,
v
New York State Office of Children and Family Services, Respondent.

Calendar Date:May 23, 2022

Before:Egan Jr., J.P., Lynch, Pritzker, Ceresia and Fisher, JJ.

Jeffrey O., Cortland, petitioner pro se.
Letitia James, Attorney General, Albany (Jennifer L. Clark of counsel), for respondent.

Lynch, J.
Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Cortland County) to review a determination of respondent denying petitioner's application to have a report maintained by the Statewide Central Register of Child Abuse and Maltreatment amended to be unfounded and expunged.
Petitioner is the father of a child (born in 2017). The child's mother (hereinafter the mother) also has two older children from a prior relationship. In September 2017, petitioner and the mother got into a verbal dispute while driving to a birthday party with the three children. The dispute quickly escalated and petitioner allegedly choked the mother in the children's presence and threw her car keys across the street, prompting one of the older children to retrieve them. The subject child was two months old at the time, and the mother's older children were approximately five and six years old. Police were called and criminal charges were brought against petitioner. The case was ultimately dismissed and the criminal record was sealed in January 2018.
A report was made to the Statewide Central Register of Child Abuse and Maltreatment regarding the incident and, following an investigation by the Cortland County Department of Social Services (hereinafter DSS), the report was marked as indicated against petitioner for maltreatment of the children (see Social Services Law § 412 [7]). The indicated report was forwarded to respondent and petitioner sought to have the report amended to be unfounded and sealed. Following an administrative review, respondent denied the request. An administrative hearing was held before an Administrative Law Judge (hereinafter ALJ), who upheld the denial of petitioner's request, determining that the fair preponderance of the evidence supported the indicated finding of maltreatment and that the report was relevant and reasonably related to childcare issues. Petitioner commenced this CPLR article 78 proceeding challenging that determination, which was transferred to this Court pursuant to CPLR 7804 (g).
We confirm. Contrary to petitioner's contention, the finding of maltreatment is supported by a sound and substantial basis in the record. "'To establish maltreatment, the agency was required to show by a fair preponderance of the evidence that the physical, mental or emotional condition of the child[ren] had been impaired or was in imminent danger of becoming impaired because of a failure by petitioner to exercise a minimum degree of care in providing the child[ren] with appropriate supervision or guardianship'" (Matter of Tammy OO. v New York State Off. of Children & Family Servs., 202 AD3d 1181, 1182 [2022], quoting Matter of Gerald HH. v Carrion, 130 AD3d 1174, 1175 [2015]). This Court's review "is limited to whether the determination to deny the request to amend and seal the indicated report is supported by substantial evidence" (Matter of Sleiman v New York State Cent. Register of [*2]Child Abuse & Maltreatment, 193 AD3d 1323, 1323 [2021] [internal quotation marks, brackets and citation omitted], lv denied 38 NY3d 905 [2022]; accord Matter of Tammy OO. v New York State Off. of Children & Family Servs., 202 AD3d at 1182) — "a minimal standard that requires 'such relevant proof as a reasonable mind, may accept as adequate to support a conclusion or ultimate fact'" (Matter of Tammy OO. v New York State Off. of Children & Family Servs., 202 AD3d at 1182, quoting Matter of Sleiman v New York State Cent. Register of Child Abuse & Maltreatment, 193 AD3d at 1323). "'[H]earsay is admissible in expungement hearings and, if sufficiently relevant and probative, may constitute substantial evidence in support of the underlying determination'" (Matter of Tammy OO. v New York State Off. of Children & Family Servs., 202 AD3d at 1182 [citation omitted], quoting Matter of Ribya BB. v Wing, 243 AD2d 1013, 1014 [1997]).
During the hearing, DSS presented testimony from two caseworkers who investigated the underlying incident. Both caseworkers testified that, when they interviewed the mother, she confirmed that she and petitioner got into a verbal altercation, which turned physical. In particular, when they arrived at the party, the mother told petitioner that she was going to drive back home with the children, prompting him to take her keys. When she tried to grab the keys back, she "accidentally ripped [petitioner's] shirt." The caseworkers recounted the mother's statement that petitioner then threw her phone and keys out of the car, walked around to her side of the car and choked her.
When the two older children were interviewed the next day, they confirmed the mother's recounting of the incident, stating that petitioner threw the mother's keys and phone out of the car, prompting the six-year-old child to go into the street to retrieve the keys. One of the children relayed to the caseworker that he saw petitioner choke the mother and confirmed that the children were crying and screaming at the time.
Petitioner's testimony regarding the incident differed in certain respects. According to petitioner, the couple got into a verbal dispute on the way to the birthday party and one of the mother's older children asked them to stop bickering. Once they arrived, the mother started screaming at him to get out of the car. She then got out of the car, went to the baby and started changing his diaper. According to petitioner, when he took the mother's keys out of the ignition, the mother leaned over the baby's car seat, grabbed him by the beard and ripped his shirt. Petitioner then got out of the car, walked over to the mother and asked, "what are you doing?" The mother told him that she was leaving and he responded, "you can leave after I take [the baby] out of the car." The mother then began lunging at him and grabbing at the keys, prompting petitioner to push her away "at her chest." Petitioner admitted that he continued pushing the mother [*3]while he was trying to get the baby out of the car, and also threw her keys and phone so she would go get them and leave him alone. Petitioner denied choking the mother during the altercation, stating that it may have appeared that way to the children when he was pushing her away and acknowledging that the incident was "scary" for them. When questioned on cross-examination about why he simply did not walk away from the vehicle when he had the keys in order to de-escalate the situation, petitioner stated that he wanted to take the baby into the party.
Petitioner entered into evidence a February 2019 certificate of completion for an anger management course, as well as various letters submitted by friends and family on his behalf. In one of those letters, a friend who was at the party and present for the altercation confirmed that she "saw [the mother] yelling at [petitioner] and putting her hands on him." She also saw petitioner "pushing [the mother] off of him." A letter from petitioner's sister made a similar representation as it pertained to the mother's conduct. Petitioner also submitted a letter that the mother wrote on his behalf, which stated that he "goes above and beyond for [her] and [the baby], as well as [the two older children]." Although the mother's letter stated that there were no ongoing concerns about domestic violence between the two of them, the letter did not specifically refute the allegations against petitioner pertaining to the September 2017 incident.
In denying petitioner's request to amend and seal the indicated report, the ALJ emphasized that petitioner admitted engaging in a physical altercation with the mother in the children's presence while he was attempting to get the baby out of the car seat and found that his "willingness to engage in violent disagreements over physical possession of an infant constitutes a clear failure to exercise a minimum degree of care." Although the ALJ found that the mother also bore some responsibility, she noted that such "mutual participation does not eliminate the causal connection between [petitioner's] conduct and the risk of harm to the children," as he "chose to exit the vehicle and to re-engage in the physical altercation in the presence of the children, despite having possession of the mother's car keys and telephone."
We conclude that these findings are supported by a sound and substantial basis in the record. Regardless of whether petitioner actually choked the mother, he admitted that he engaged in a physical altercation with her in front of the children while he was attempting to get the baby out of the car seat. He also threw her keys across the street, prompting the mother's six-year-old child to cross the street, unsupervised, to retrieve them. His explanation for persisting in the altercation — that he wanted to take the baby to the party — reveals extraordinarily poor judgment on his part. Notwithstanding the letters submitted by friends and family attesting [*4]to petitioner's character, petitioner's conduct amounted to a failure to exercise a minimum degree of care in providing the children with appropriate supervision or guardianship (see Social Services Law § 412 [2] [a]; Family Ct Act § 1012 [f] [i] [B]; Matter of Brown v Velez, 153 AD3d 517, 518 [2017], appeal dismissed 30 NY3d 1028 [2017]). Given that the children witnessed and were in close proximity to the altercation, the two older children were "screaming and crying" during it, and the six-year-old child had to cross the street by himself to retrieve the mother's keys, there is substantial evidence in the record to support the finding that the children's "'physical, mental or emotional condition'" was impaired or was in imminent danger of becoming impaired as a result of petitioner's conduct (Matter of Christopher JJ. v Spencer, 204 AD3d 1193, 1194 [2022], quoting 18 NYCRR 432.1 [b] [1] [ii]). Moreover, the ALJ's finding that petitioner's conduct was "'relevant and reasonably related' to [his] potential involvement in child care, adoption and foster care" (Matter of Tammy OO. v New York State Off. of Children & Family Servs., 202 AD3d at 1184, quoting Social Services Law § 422 [8] [c] [ii]), is supported by the evidence that petitioner studied elementary education, had completed internships in the field and had previously worked at a home for wayward boys. Accordingly, the ALJ's determination will not be disturbed.[FN1]
Equally without merit is petitioner's assertion that his due process rights were violated by the ALJ's consideration of "charges that were sealed." Pursuant to CPL 160.50, "[u]pon termination of a criminal action in favor of an accused . . . the record of such action 'shall be sealed' . . . and . . . all official records and papers relating to the arrest or prosecution 'on file with the division of criminal justice services, any court, police agency, or prosecutor's office shall be sealed and not made available to any person or public or private agency'" (Matter of Joseph M. [New York City Bd. of Educ.], 82 NY2d 128, 132 [1993], quoting CPL 160.50 [1] [c] [emphasis omitted]). First, we note that the sealed criminal records at issue were not actually offered into evidence in this case and, contrary to petitioner's suggestion, the ALJ did not rely on these records in her determination. Rather, one of DSS's caseworkers referred to the content of the police report during her testimony and relied on a progress note containing statements therefrom to refresh her recollection as to what the report said. In any event, a party who "affirmatively places the underlying conduct at issue by bringing a civil suit" waives the statutory protection afforded by CPL 160.50, which "may not be used as a sword to gain an advantage in a civil action" (Green v Montgomery, 95 NY2d 693, 701 [2001] [internal quotation marks and citation omitted]). In his petition, petitioner emphasized that the criminal charges had been dropped. Inasmuch as petitioner [*5]placed the underlying conduct at issue by bringing a civil expungement proceeding and attempted to circumvent liability by relying on the fact that the criminal charges were dismissed, he waived any protections afforded by CPL 160.50 to this matter.
Nor are we persuaded by petitioner's argument that his due process rights were violated by the six-month delay in finalizing the indicated report. Under Social Services Law § 424 (7), a child protective services agency has 60 days to determine whether a report of abuse or maltreatment is indicated or unfounded. However, "[t]he time limit imposed is . . . directory, not mandatory, . . . and [a] petitioner is not entitled to have [the agency's] determination vacated on this basis absent a showing of substantial prejudice" (Matter of Maria PP. v Commissioner of NYS Off. of Children & Family Servs., 162 AD3d 1297, 1298 [2018] [internal quotation marks and citation omitted]). A caseworker indicated that the delay here was attributable to high caseloads and petitioner has not established any prejudice flowing therefrom. In these circumstances, the failure to comply with the 60-day deadline does not warrant vacatur (see id.; see generally Matter of Meyers v Maul, 249 AD2d 796, 797 [1998], lv denied 92 NY2d 807 [1998]). Petitioner's remaining contentions, to the extent not expressly addressed, have been considered and found lacking in merit.
Egan Jr., J.P., Pritzker, Ceresia and Fisher, JJ., concur.
ADJUDGED that the determination is confirmed, without costs.

Footnotes

Footnote 1: Contrary to petitioner's assertion, the children's statements to one of the caseworkers regarding the incident were generally corroborated by petitioner's own admission that he and the mother engaged in a physical altercation in front of them, regardless of whether any choking was involved. Moreover, petitioner himself testified that the children were scared during the altercation.